UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X     Index No.: 1:25-cv-10095-KPF
CLAUDIA TRIPI,

          Plaintiff,

    -against-
                                      **AMENDED COMPLAINT**


CR GEMS, INC.,
JSD TRADING LTD and                        Plaintiff Demands a
JEETENDRA SINGH DOSANJH, individually,        Trial by Jury

                    Defendants.
------------------------------------------------------------------X


Plaintiff, by and through her attorneys, Phillips & Associates, PLLC, hereby complains of the

Defendants, upon information and belief, as follows:


### NATURE OF THE CASE

1. Plaintiff complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified <u>42 U.S.C.</u>

   §§ 2000e *et seq*. ("Title VII") and to remedy violations of the <u>New York Executive Law</u>

   ("NYSHRL") and the <u>Administrative Code of the City of New York</u> ("NYCHRL"), based

   upon the supplemental jurisdiction of this Court pursuant 28 U.S.C. §1367, seeking damages

   to redress the injuries Plaintiff has suffered as a result of being harassed and discriminated

   against by Defendant on the basis of her race (Hispanic), national origin, and gender (female),

   and height and weight under the NYCHRL together with sexual harassment, creating a hostile

   work environment, retaliation, and unlawful termination.

### JURISDICTION AND VENUE

2. This action involves a Question of Federal Law.

3. Venue is proper in this district based upon the fact that a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of the State of New York.

4. The Court has jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction for the State and City law claims pursuant to 28 U.S.C. § 1367.

## PROCEDURAL PREREQUISITES

5. Plaintiff timely filed a complaint, upon which this Complaint is based, with the United States Equal Employment Opportunity Commission ("EEOC").

6. Plaintiff received a Notice of Right to Sue from the EEOC dated 12/4/2025, with respect to the instant charges of discrimination. A copy of the Notice is annexed to this Complaint.

7. This action is being commenced within 90 days of receipt of the Notice of Right to Sue.

## PARTIES

8. Plaintiff is a Hispanic female resident of the State of New York.

9. At all times material, Defendant CR Gems, Inc. (hereinafter "Defendant CR") was and is a domestic business corporation duly existing under the laws of the State of New York.

10. At all times material, Defendant JSD Trading Ltd. (hereinafter "JSDT") was and is a foreign business corporation duly existing under the laws of the United Kingdom that operated, conducted business in, and purposefully directed business activities toward New York, New York, including supplying inventory for sale in New York, funding and participating in trade shows in the United States, processing payments connected to the New York operations, and exercising control over the terms and conditions of Plaintiff's employment.

11. At all times material, Defendant Jeetendra Singh Dosanjh (hereinafter "Defendant DOSANJH") was and is an individual male who resides in London, United Kingdom, and is

the owner, CEO, President, and controlling principal of Defendant CR and Defendant JSDT. Defendant DOSANJH exercised centralized control over both entities' operations, including the New York booth where Plaintiff worked, and made or directed decisions regarding hiring, compensation, scheduling, inventory, pricing, discipline, and termination. Defendant CR, Defendant JSDT, and Defendant DOSANJH are collectively referred to herein as "Defendants."

12. Defendants CR and JSDT operated as a single integrated enterprise and/or joint employers of Plaintiff, and JSDT also functioned as an alter ego of Defendant CR and Defendant DOSANJH with respect to the conduct alleged herein.

13. At all relevant times, Defendant DOSANJH directed the New York operations from the United Kingdom, including but not limited to pricing, inventory decisions, customer orders, scheduling, hiring-related decisions, compensation decisions, and discipline.

14. Gemstones and related inventory were regularly shipped from JSDT in the United Kingdom directly to Defendant CR's New York booth for sale to customers in New York.

15. When submitting gemstones to the Gemological Institute of America in New York, Defendants routinely used either "CR Gems" or "JSD Trading" interchangeably for billing purposes, and payments connected to the New York operations were often processed through JSDT.

16. Trade shows and industry events in the United States, including but not limited to Las Vegas, Miami, and JCK, were registered for and/or paid for through JSDT, Defendant CR, and/or Defendant DOSANJH's personal credit card, while the business at those events operated publicly under the CR Gems name.

17. Defendants shared payroll and accounting functions, and Defendants' accountant treated CR and JSDT as a single operation depending on Defendant DOSANJH's direction.

18. Defendant DOSANJH used the same email address, phone number, and communication channels on behalf of both CR and JSDT, and issued instructions from London concerning the daily operation of the New York booth where Plaintiff worked.

19. Defendants CR and JSDT did not maintain meaningful separation in their operations, labor relations, inventory flow, billing practices, and financial dealings, but instead operated as one unified business enterprise under Defendant DOSANJH's centralized control.

20. Upon information and belief, Defendants used the nominal separation between CR and JSDT to shield assets and limit liability while continuing to operate the entities as a single integrated enterprise and/or joint employers with respect to Plaintiff's employment.

21. At all times material, Plaintiff was employed by Defendants CR and JSDT, which jointly employed her and/or operated as a single integrated enterprise with respect to her employment, under the centralized control of Defendant DOSANJH.

## MATERIAL FACTS

22. On or about September 22, 2022, Plaintiff began working for Defendants as a "Sales/Customer Service Representative," with an annual rate of pay of approximately $52,000.00.

23. At all times material, Defendant CR's Manager who hired Plaintiff, Amber Morris (hereinafter "Ms. Morris"), had supervisory authority over Plaintiff.

24. Defendants operated multiple locations, including locations in the United Kingdom and in New York at 23 W. 47th Street, New York, NY 10036, where Plaintiff worked. The New York operation was not a standalone domestic business but was an integral part of Defendants' unified international gemstone enterprise, receiving inventory, financing, operational

direction, and managerial control directly from the United Kingdom through JSDT and Defendant DOSANJH.

25. At all relevant times, Defendant DOSANJH, as the owner and controlling principal of both CR and JSDT, exercised direct and centralized control over all material aspects of the New York operations from the United Kingdom, including pricing, inventory decisions, customer orders, scheduling, hiring, compensation, discipline, and termination. Defendant DOSANJH issued instructions for the New York booth while physically located in London, using the same email address, phone number, and communication channels on behalf of both CR and JSDT interchangeably.

26. Gemstones and related inventory were regularly shipped from JSDT in the United Kingdom directly to Defendant CR's New York booth for sale to customers in New York. Inventory and pricing decisions for the New York location were made centrally by Defendant DOSANJH through JSDT.

27. When submitting gemstones to the Gemological Institute of America ("GIA") in New York, Defendants routinely used either "CR Gems" or "JSD Trading" interchangeably for billing purposes, and payments connected to the New York operations were often processed through JSDT rather than CR.

28. Defendants shared payroll and accounting functions. Defendants' accountant treated CR and JSDT as a single unified operation, and the allocation of expenses and payments between the two entities was made at Defendant DOSANJH's direction rather than according to any consistent corporate separation.

29. Defendants CR and JSDT did not maintain meaningful separation in their operations, labor relations, inventory flow, billing practices, or financial dealings, but instead operated as one

unified business enterprise under Defendant DOSANJH's centralized control. Upon information and belief, Defendants used the nominal separation between CR and JSDT to shield assets and limit liability while continuing to operate the entities as a single integrated enterprise with respect to Plaintiff's employment.

30. In or around October 2022, Defendant DOSANJH traveled to the United States and met Plaintiff for the first time in person.

31. Defendant DOSANJH arrived late in the day and invited Ms. Morris and Plaintiff to get a drink together after work hours.

32. During their initial encounter, Defendant DOSANJH asked Plaintiff a few personal questions, including her marital status and age.

33. When Plaintiff informed Defendant DOSANJH that she did not have children, he responded, "WELL, THAT'S A PLUS BECAUSE WE WILL BE DOING SOME TRAVELING WITH THE COMPANY."

34. Throughout Plaintiff's employment with Defendants, she has been subjected to continuous and systematic discrimination directed at her on the basis of her race, national origin, gender (female), height and weight.

35. For example, Defendant DOSANJH would become very upset with Plaintiff for making nominal mistakes as a new employee. He would call her and say things such as: "USE YOUR BRAINS; YOU DON'T HAVE BRAINS! ARE YOU DUMB, WOMAN?"

36. Alluding to her race and national origin as somehow lacking, Defendant DOSANJH made several comments including, "PUNJABI ARE THE BEST. PUNJABI WOMEN STAY IN THE HOUSE TO COOK AND CLEAN AND MEN TAKE THE LEAD."

37. Plaintiff was not provided any training and had to teach herself the company's computer system and processes to learn her job.

38. As the months progressed, Defendant DOSANJH's running misogynistic and racial commentary worsened.

39. For example, Defendant DOSANJH said, "ARE YOU STUPID WOMAN? ARE YOU AN IDIOT? SHUT UP, I'M THE BOSS. YOU DO WHAT I SAY. JUST DO YOUR JOB AND SHUT UP. WHY DID YOU MAKE A MISTAKE? OH, IT'S BECAUSE YOU'RE A WOMAN."

40. The ever worsening, severe and pervasively hostile work environment continued as Plaintiff's first year of employment ended.

41. Defendant DOSANJH's verbal abuse directed towards Plaintiff started including personal attacks regarding her appearance.

42. For example, Defendant DOSANJH told Plaintiff that she "WAS VERY SHORT AND NEEDED LONGER LEGS" or "BUY SOME HEELS WOMAN!" He would say this sometimes if he observed her struggling to reach high shelves over a counter in the showroom.

43. Additionally, Defendant DOSANJH repeatedly referred to Plaintiff as a "STUPID COW" and "FUCKING COW," blatantly criticizing her weight and bullying her in the process.

44. Defendants had multiple cameras set up throughout the workplace and showroom because of the nature of the business: loose gemstones.

45. Plaintiff understood the necessity of surveillance equipment but felt that Defendant DOSANJH was using the video surveillance to stalk and harass her unnecessarily. Although Defendant DOSANJH was physically located in the United Kingdom, he monitored the New York booth through the camera system and used it as a tool to control and harass Plaintiff on a daily basis

— further demonstrating his direct and centralized management of the New York operation from abroad.

46. For example, Defendant DOSANJH was very critical of any time she spent away from her workstation including personal bathroom use. He would ask her, "Why did you take so long in the bathroom? Were you taking a dump?" in an inappropriate manner.

47. Additionally, if she was running a few minutes late or got up from her area out of camera range, Defendant DOSANJH would telephone Plaintiff and demand that she take a picture of herself to show her location and/or what she was doing.

48. At lunch time, if Plaintiff exceeded her allotted 30-minute break at all, Defendant DOSANJH would call her saying if she "HAD LONGER LEGS [SHE] WOULD MOVE FASTER."

49. At times, Defendant DOSANJH's verbal abuse would continue by him telling her, "ARE YOU RETARDED WOMAN? DO YOU NEED A BABYSITTER? YOU'RE NOT A BABY! YOU'RE NOT SPECIAL!"

50. Defendant DOSANJH's relentless, overbearing, and intrusive management of Plaintiff's whereabouts made her very uncomfortable.

51. Plaintiff was very upset by the way Defendant DOSANJH spoke to her on a daily basis, routinely calling Plaintiff derogatory slurs and pejoratively referring to Plaintiff as: "FUCKING COW, SHORT, SLOW LATINA, STUPID WOMAN, DUMB WOMAN, BITCH," and other similar offensive combinations of such slurs.

52. Plaintiff complained on many occasions to Ms. Morris and objected to Defendant DOSANJH that he should not speak to her that way.

53. Ms. Morris took no action on Plaintiff's behalf. Instead, her usual response to Plaintiff's complaints of discrimination and harassment in the workplace consisted of making excuses for Defendant DOSANJH's behavior.

54. Ms. Morris would tell Plaintiff that she needed to be "more understanding" as Defendant DOSANJH was "under an enormous amount of pressure and stress."

55. In or around March 2023, during a business trip to Miami, Defendant DOSANJH required that Plaintiff accompany him to the Versace mansion for an industry party. At this party, alcohol, illegal drugs, and prostitutes were available to the guests. That trip was part of Defendants' trade show and industry event operations, which were funded and registered through JSDT, CR, and/or Defendant DOSANJH's personal credit card, while the business at those events operated publicly under the CR Gems name — reflecting the complete financial and operational integration of the two entities.

56. At the mansion, Defendant DOSANJH became very inebriated and repeatedly asked Plaintiff's opinion whether he should patronize and engage in sexual activity with the sex workers at the party.

57. Between approximately August and December 2023, Defendant DOSANJH would send video chats to Plaintiff and FaceTime her while he was drunk, making flirtatious comments.

58. Plaintiff found her boss's behavior highly inappropriate, and it made her uncomfortable.

59. On one video call in particular, Defendant DOSANJH had on gym shorts and was gesturing towards his genitalia with the phone, exposing what appeared to be the outline of his erect penis through the gym shorts.

60. Plaintiff was mortified and shocked at this inappropriate gesture during the video call with Defendant DOSANJH.

61. In or around January 2024, Defendant DOSANJH began to call the New York office more often than he had in the past.

62. During many of these calls, it was apparent to Plaintiff that Defendant DOSANJH was inebriated.

63. Whether he was drunk or sober, Defendant DOSANJH's discriminatory verbal barrage was the same. His comments included: "ARE YOU AN IDIOT WOMAN? SHUT UP COW. I CANNOT TALK TO A PERSON WHO HAS NO BRAINS LIKE YOU. I DON'T KNOW HOW YOU STILL HAVE A HUSBAND. I WANT TO MEET HIM SO I CAN ASK HIM HOW HE CAN STILL BE IN A RELATIONSHIP WITH SUCH A DUMB WOMAN LIKE YOU. YOU HAVE NO BRAINS."

64. Plaintiff would attempt to stay quiet and ignore Defendant DOSANJH's abuse out of fear for her job, as she relied on its income.

65. However, Plaintiff would often go into the bathroom after one of Defendant DOSANJH's assaults and cry. She would go home and cry while telling her husband what she endured on any particular day.

66. In or around March 2024, Defendants hired another Sales/Customer Service Representative named David Beck ("Mr. Beck"). The decision to hire Mr. Beck, like all material employment decisions at the New York booth, was made or directed by Defendant DOSANJH from the United Kingdom, acting through and on behalf of both CR and JSDT.

67. Mr. Beck had the same essential job duties and responsibilities as Plaintiff.

68. Mr. Beck was completely inexperienced in the gemstone industry before Defendants hired him.

69. Mr. Beck relied on Plaintiff to teach him about gemstones, including their color, weight, and other crucial aspects of the job.

70. Mr. Beck was a similarly situated employee as Plaintiff but male.

71. Plaintiff was treated in a disparate manner compared to her male co-worker, Mr. Beck.

72. For example, Defendants allowed Mr. Beck to come in late and frequently take days off.

73. Plaintiff was in charge of Defendants' payroll — a function that was shared across CR and JSDT and managed as a single operation — and learned that despite being a new employee without experience in the gem industry, Mr. Beck was making significantly more money than she was.

74. Plaintiff questioned Defendant DOSANJH about Mr. Beck's disproportionate compensation and was told to "MIND YOUR OWN BUSINESS, WOMAN!"

75. Mr. Beck was allowed to come in late, leave early on Fridays, work less in the showroom area, and take long lunches without any repercussions. Plaintiff was not permitted to do any of those things.

76. Plaintiff's job duties and responsibilities increased during this time because she had to perform much of Mr. Beck's work in addition to her own.

77. After much begging, Defendant DOSANJH finally relented and gave her a small raise but warned her that he "WILL NOT PAY OVERTIME AND IF [SHE DIDN'T] LIKE IT [SHE COULD] LEAVE."

78. In or around June or July 2024, Plaintiff attended a gem show in Las Vegas along with Defendant DOSANJH and Ms. Morris. The Las Vegas trade show, like other industry events attended by Plaintiff, was registered and paid for through JSDT, CR, and/or Defendant DOSANJH's personal credit card, while the booth operated publicly under the CR Gems name.

79. On one of the evenings when Defendant DOSANJH was visibly intoxicated, he grabbed her arm while they were at the casino and said, "PLEASE DON'T LEAVE ME WITH THIS COW

(referring to Ms. Morris) BECAUSE IF YOU DO SHE WILL TAKE ME TO MY ROOM AND SHE WILL WANNA FUCK ME."

80. Plaintiff was very upset and disturbed by her boss's behavior and left the area.

81. In or around the summer of 2024, Plaintiff started to complain about Defendant DOSANJH's treatment directly to him. She would beg him to stop speaking to her that way.

82. In response, Defendant DOSANJH would tell her to shut up and call her again a "COW," an "IDIOT WOMAN," and similar slurs.

83. More evidence of Defendant DOSANJH's sexist and misogynistic bias arose in instances where he told Plaintiff that "WOMEN IN [HIS] COUNTRY WERE TREATED POORLY AND THEY BELONG IN THE KITCHEN RAISING A FAMILY AND THAT THEY SHOULD ALWAYS SHUT UP." He reiterated to Plaintiff that "IN THE PUNJAB CULTURE MEN ARE THE ONES WHO HAVE THE BALLS IN THE PANTS, AND SO FOR THAT REASON, [DEFENDANT DOSANJH] WILL TREAT [PLAINTIFF] DIFFERENT."

84. Things escalated when Defendant DOSANJH began calling Plaintiff's personal cell phone at home late at night.

85. Sometimes Defendant DOSANJH would hand his phone to friends he was with and have them flirt with Plaintiff, then hang up.

86. On other non-work-related telephone calls to Plaintiff from Defendant DOSANJH, he would activate the camera portion of his phone, showing her himself lying down in his shorts or underwear.

87. Plaintiff found these communications from her boss offensive.

88. Over the course of her tenure of employment with Defendants, Plaintiff's mental health was severely affected in a negative way.

89. Plaintiff told Defendant DOSANJH that his treatment of her was making her mental health worse.

90. He replied that he "DIDN'T CARE ABOUT [HER, HER] PROBLEMS OR [HER] PERSONAL LIFE."

91. Physically, Defendant DOSANJH's manipulation of Plaintiff's bathroom breaks affected her urinary tract health, and she kept getting infections because she was suppressing her urge to go to the bathroom out of fear of her boss timing her and berating her over her use of the facilities.

92. On or about October 2, 2024, Plaintiff left on a vacation in Peru. While on vacation, she lost her phone.

93. On or about October 5, 2024, Plaintiff borrowed her father's cell phone to check in with Defendant DOSANJH.

94. Upon answering, Defendant DOSANJH told her that he had been trying to reach her during her absence. Plaintiff explained that she had lost her phone during the trip and had yet to replace it.

95. Inexplicably, Defendant DOSANJH told her she was fired. When Plaintiff tried to get an actual reason for the termination, she was told the following: "I'M DONE WITH YOU. I'M JUST SICK OF YOU. I'M TIRED OF YOU. IT'S TIME WE GO OUR SEPARATE WAYS. IT'S ALMOST LIKE YOU'RE MY GIRLFRIEND AND WE'RE BREAKING UP."

96. Plaintiff was shocked by these statements and asked her boss what he was talking about.

97. Defendant DOSANJH continued in the same vein, telling her that he just didn't want her there anymore and to come by and pick up her things.

98. When Plaintiff returned to the office to collect her personal items, Mr. Beck was sitting in her former seat and appeared to have assumed her role for Defendants.

13

99. On or about October 12, 2024, Defendants terminated Plaintiff. The decision to terminate Plaintiff was made by Defendant DOSANJH from the United Kingdom, acting in his capacity as the owner and controlling principal of both CR and JSDT, and was effectuated through the unified employment operation that CR and JSDT operated jointly.

100. Defendant would not have terminated Plaintiff but for her race and gender.

101. Defendant would not have retaliated against Plaintiff but for her complaints of race and gender discrimination.

102. Defendant would not have discriminated against Plaintiff but for her race, gender, height, and weight.

103. As a result of Defendants' actions, Plaintiff felt and continues to feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

104. As a result of Defendants' discriminatory and intolerable treatment of Plaintiff, she suffered and continues to suffer severe emotional distress.

105. As a result of the acts and conduct complained of herein, Plaintiff has suffered, and will continue to suffer, the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

106. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages as against the Defendants.

**AS A FIRST CAUSE OF ACTION
FOR RACE, NATIONAL ORIGIN
AND SEX/GENDER DISCRIMINATION UNDER TITLE VII
(only against corporate Defendants)**

107. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if same were set forth herein fully at length.

108. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendants' violations of Title VII's prohibition against discrimination in employment based in whole or in part upon an employee's race, national origin, and sex/gender.

109. Defendants CR and JSDT were, at all relevant times, joint employers and/or a single integrated enterprise with respect to Plaintiff's employment. Defendant DOSANJH, as the owner and controlling principal of both entities, exercised centralized control over all material terms and conditions of Plaintiff's employment from the United Kingdom, including hiring, compensation, scheduling, discipline, and termination. The unlawful employment practices described herein were carried out through this unified enterprise, and both CR and JSDT are therefore liable as employers under Title VII.

110. Plaintiff's work environment became hostile and was permeated with discrimination, ridicule, insults, and other discriminatory acts directed at her on the basis of her race, national origin, and sex/gender.

111. Defendants engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff because of her race, national origin, and sex/gender, including

15

but not limited to subjecting her to a hostile work environment, disparate treatment, and unlawful termination.

112. Defendants' actions are a continuing violation.

113. As a result of Defendants' discriminatory treatment of Plaintiff, she has suffered severe emotional distress, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, physical humiliation, physical injury, intimidation, special damages, fear, anxiety, depression, anger, and other non-pecuniary losses.

114. Plaintiff is entitled to the maximum amount allowable under the law.

**AS A SECOND CAUSE OF ACTION**
**UNDER TITLE VII FOR RETALIATION**
**(only against corporate Defendants)**

115. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

116. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

117. Defendants CR and JSDT, operating as a single integrated enterprise and/or joint employers under the centralized control of Defendant DOSANJH, violated this section as set forth herein. Because all material employment decisions — including the decision to terminate Plaintiff — were made or directed by Defendant DOSANJH from the United Kingdom acting on behalf of both entities, both CR and JSDT are liable for the retaliatory conduct alleged herein.

16

118. Plaintiff engaged in protected activity when she complained to Defendant DOSANJH and Ms. Morris about the discriminatory and harassing treatment to which she was subjected.

119. Plaintiff's complaints were futile, and she suffered adverse employment actions as a direct result, culminating in her termination on or about October 12, 2024.

120. In response to Plaintiff's protected activity, Defendants subjected Plaintiff to adverse employment action, humiliation, and retaliatory conduct.

121. Defendants had no good faith justification for their actions and conduct against Plaintiff.

122. Defendants' actions were and are a continuing violation.

123. As a result of Defendants' retaliatory treatment of Plaintiff, she has suffered severe emotional distress, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, physical humiliation, physical injury, intimidation, special damages, fear, anxiety, depression, anger, and other non-pecuniary losses.

124. Plaintiff is entitled to the maximum amount allowable under this law.

**AS A THIRD CAUSE OF ACTION
FOR VIOLATION OF THE FEDERAL EQUAL PAY ACT
29 U.S.C. § 206(d)
(only against corporate Defendants)**

125. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

126. The Federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), prohibits employers from paying employees of one sex at a rate less than employees of the opposite sex for equal work on jobs that require equal skill, effort, and responsibility, and which are performed under similar working conditions.

127. Defendants CR and JSDT, operating as a single integrated enterprise and/or joint employers, jointly determined the compensation paid to employees at the New York booth, including Plaintiff and Mr. Beck. Payroll and accounting functions were shared across CR and JSDT and treated as a single operation under Defendant DOSANJH's direction. Compensation decisions, including those resulting in the pay disparity alleged herein, were made centrally by Defendant DOSANJH acting on behalf of both entities.

128. Plaintiff and comparator employee David Beck ("Mr. Beck") performed substantially equal work requiring equal skill, effort, and responsibility, under similar working conditions. Plaintiff trained Mr. Beck and performed more complex job duties than he did.

129. Defendants paid Mr. Beck — a less experienced male employee — a higher rate of pay than Plaintiff, a female employee, for substantially equal work.

130. The pay disparity between Plaintiff and Mr. Beck was not based on a seniority system, merit system, a system that measures earnings by quantity or quality of production, or any factor other than sex. Defendants provided no legitimate, gender-neutral explanation for the disparity in pay.

131. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered lost wages, lost benefits, lost opportunities for advancement, and other economic damages.

132. Defendants' violation of the EPA was willful, entitling Plaintiff to liquidated damages.

133. Plaintiff is entitled to all legal and equitable relief available under the EPA, including back pay, front pay, liquidated damages, attorneys' fees, and costs.

**AS A FOURTH CAUSE OF ACTION**
**UNDER NEW YORK STATE LAW**
**DISCRIMINATION**
**(against all Defendants)**

134. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

135. <u>New York State Executive Law</u> §296 provides that, "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's…race, national origin, sex…to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

136. Defendants CR, JSDT, and DOSANJH are each liable as employers under the NYSHRL. CR and JSDT operated as a single integrated enterprise and/or joint employers with respect to Plaintiff's employment, sharing payroll, accounting, inventory, and operational management under the centralized control of Defendant DOSANJH. Defendant DOSANJH is individually liable as the owner and controlling principal who exercised direct authority over the terms and conditions of Plaintiff's employment and personally carried out the discriminatory conduct alleged herein.

137. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her race, national origin, and gender, together with creating a hostile work environment and retaliating against her for complaining about the discrimination.

138. Plaintiff hereby makes a claim against Defendants under all applicable paragraphs of Executive Law § 296.

139. Defendants' actions are a continuing violation.

19

140. As a result of Defendants' discriminatory treatment of Plaintiff, she has suffered severe emotional distress, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, physical humiliation, physical injury, intimidation, special damages, fear, anxiety, depression, anger, and other non-pecuniary losses.

141. Plaintiff is entitled to the maximum amount allowable under this law

**AS A FIFTH CAUSE OF ACTION**
**UNDER NEW YORK STATE LAW**
**RETALIATION**
**(against all Defendants)**

142. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

143. New York State Executive Law §296(7) provides that "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

144. Defendants CR, JSDT, and DOSANJH engaged in an unlawful retaliatory practice by discriminating against and otherwise retaliating against Plaintiff because of her race, national origin, sex/gender, and her complaints of discrimination, together with creating a hostile work environment. Because CR and JSDT operated as a single integrated enterprise and/or joint employers, and because Defendant DOSANJH personally directed the retaliatory conduct — including Plaintiff's termination — from the United Kingdom on behalf of both entities, all Defendants are jointly and severally liable for the retaliation alleged herein.

145. Plaintiff engaged in protected activity when she complained to her manager, supervisor, and directly to Defendant DOSANJH about the discriminatory and harassing treatment she was subjected to.

146. Plaintiff's complaints were futile, and she suffered adverse employment actions as a direct result.

147. In response, Defendants subjected Plaintiff to adverse employment action, humiliation, and retaliatory conduct.

148. Defendants had no good faith justification for their actions and conduct against Plaintiff.

149. Defendants' actions were and are a continuing violation.

150. As a result of Defendants' retaliatory treatment of Plaintiff, she has suffered severe emotional distress, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, physical humiliation, physical injury, intimidation, special damages, fear, anxiety, depression, anger, and other non-pecuniary losses.

151. Plaintiff is entitled to the maximum amount allowable under this law.

**AS A SIXTH CAUSE OF ACTION**
**FOR VIOLATION OF THE NEW YORK EQUAL PAY ACT**
**NYLL § 194**
**(against all Defendants)**

152. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

153. New York Labor Law § 194 prohibits employers from paying an employee at a wage rate less than the rate paid to an employee of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility, and performed under similar working conditions.

154. Defendants CR, JSDT, and DOSANJH are each liable as employers under NYLL § 194. CR and JSDT shared payroll and accounting functions and treated compensation decisions as a single operation under Defendant DOSANJH's direction. Defendant DOSANJH personally made or directed all compensation decisions for the New York booth, including the decision to pay Mr. Beck at a higher rate than Plaintiff, acting on behalf of both CR and JSDT.

155. Plaintiff and Mr. Beck performed substantially equal work requiring equal skill, effort, and responsibility. Plaintiff also trained Mr. Beck in gemstone grading and customer service functions, and regularly performed work beyond the scope of her own assigned duties.

156. Despite performing equal or greater work, Plaintiff was paid less than Mr. Beck, a male comparator, in violation of NYLL § 194.

157. Defendants' pay practices were not based on a bona fide factor such as education, training, experience, a seniority system, or any gender-neutral factor.

158. Defendants' violation of NYLL § 194 was willful, entitling Plaintiff to liquidated damages in an amount equal to one hundred percent of the total amount of the underpayment.

159. As a result of Defendants' unlawful conduct, Plaintiff has suffered lost wages, lost benefits, and other pecuniary and non-pecuniary damages.

160. Plaintiff is entitled to all remedies available under NYLL § 194 and § 198, including back wages, liquidated damages, attorneys' fees, and costs.

**AS A SEVENTH CAUSE OF ACTION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**DISCRIMINATION**
**(against all Defendants)**

161. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

162. The Administrative Code of City of NY §8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of … race, national origin, gender…height, weight…, [t]o refuse to hire or employ or to bar or to discharge from employment such person… or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

163. Defendants CR, JSDT, and DOSANJH are each liable as employers under the NYCHRL. The NYCHRL's broad remedial construction encompasses all entities and individuals who exercise control over an employee's working conditions. Here, CR and JSDT jointly controlled all aspects of Plaintiff's employment as a single integrated enterprise, and Defendant DOSANJH directly and personally subjected Plaintiff to the discriminatory conduct described herein, acting in his individual capacity and as the owner and controlling principal of both entities.

164. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, § 8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her race, national origin, gender, height, and weight, together with creating a hostile work environment and retaliating against her for her protected complaints.

165. As a result of Defendants' discriminatory treatment of Plaintiff, she has suffered severe emotional distress, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, physical humiliation, physical injury, intimidation, special damages, fear, anxiety, depression, anger, and other non-pecuniary losses.

166. Plaintiff is entitled to the maximum amount allowable under this law.

23

**AS AN EIGHTH CAUSE OF ACTION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**RETALIATION**
**(against all Defendants)**

167. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

168. The New York City Administrative Code Title 8-107(7) provides that:

> "It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter…"

169. Defendants engaged in an unlawful retaliatory and discriminatory practice by retaliating against and otherwise discriminating against Plaintiff because of her complaints of race, national origin, gender, height, and weight discrimination. The retaliatory conduct, including Plaintiff's termination, was directed by Defendant DOSANJH from the United Kingdom and carried out through the unified employment operation of CR and JSDT, for which all Defendants are jointly and severally liable.

170. Defendants ignored Plaintiff's complaints and concerns and continued to subject her to a hostile work environment, including but not limited to verbal abuse, intimidation, and ultimately termination.

171. Defendants had no good faith justification for their actions and conduct against Plaintiff.

172. Defendants' actions were and are a continuing violation.

173. As a result of Defendants' retaliatory treatment of Plaintiff, she has suffered severe emotional distress, emotional pain, suffering, inconvenience, loss of enjoyment of life,

humiliation, physical humiliation, physical injury, intimidation, special damages, fear, anxiety, depression, anger, and other non-pecuniary losses.

174. Plaintiff is entitled to the maximum amount allowable under this law.

**AS A NINTH CAUSE OF ACTION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**INTERFERENCE WITH PROTECTED RIGHTS**
**(against all Defendants)**

175. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

176. New York City Administrative Code §8-107(19) provides:

> It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

177. Defendants, acting through their unified enterprise and through the direct conduct of Defendant DOSANJH, coerced, intimidated, threatened, and interfered with Plaintiff's exercise and enjoyment of her rights protected under the NYCHRL, including by subjecting her to ongoing verbal abuse, surveillance, retaliatory conduct, and termination in response to her protected complaints of discrimination.

178. All Defendants are jointly and severally liable for the interference with Plaintiff's protected rights as alleged herein.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A.  Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII, the New York Executive Law, the New York City Administrative Code on the basis of Plaintiff's race, national origin, gender, height and weight, together with creating a hostile work environment, retaliation, interference with protected rights, and wrongful termination;

B.  Awarding damages to Plaintiff for any lost wages and benefits, past and future, back pay and front pay, and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering and injury to her reputation;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff liquidated damages

F.  Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of this action; and

G.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy the Defendants' unlawful employment practices.

## <u>JURY DEMAND</u>

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff demands judgment against Defendants in an amount to be determined at the time of trial, plus interest, punitive damages, attorneys' fees, costs, and disbursements of this action; and for such other relief as the Court deems just and proper.

Dated: April 10, 2026
New York, New York

**PHILLIPS & ASSOCIATES, PLLC**
*Attorneys for Plaintiff*

By: <u>/s/ Seamus Barrett</u>
Seamus P. Barrett, Esq.
45 Broadway, Suite 430
New York, NY 10006
Tel: (212) 248-7431